**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:17cv1523

PHOENIX ENTERTAINMENT PARTNERS, LLC, a North Carolina LLC,

      Plaintiff,

v.

DAVID OPPERMAN;
NED KELLY INC., a Colorado corporation;
TRIPOLAR, LLC, a Colorado limited liability company;
COLEMAN COMMERCIAL PROPERTY INC., a Colorado corporation;
XCESSIVE THROTTLE INC., a Colorado corporation;
MARINA ENTERPRISES, INC., a Colorado corporation; and
7545 INC., a Colorado corporation,

      Defendants.

---

## COMPLAINT

---

      The Plaintiff, Phoenix Entertainment Partners, LLC ("Phoenix"), by its counsel, complains of the Defendants, and for its Complaint alleges as follows:

## JURISDICTION OF THE COURT

      1.    This is an action for trademark and service mark infringement in which the Defendants stand accused, variously, of distributing karaoke accompaniment tracks marked with Phoenix's federally registered trademarks and of using Phoenix's federally registered trademarks and service marks in the course of providing commercial karaoke entertainment services and related ancillary services; all without authorization.

- 1 -

2.     This action arises under §§ 32 and 43 of the Trademark Act of 1946, 15 U.S.C. §§ 1114 and 1125, as amended.

3.     This Court has exclusive jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the laws of the United States.

4.     This Court further has jurisdiction pursuant to 28 U.S.C. § 1338(a), in that this civil action arises under acts of Congress relating to trademarks, and, as to the Plaintiff's federal unfair competition claim, pursuant to 28 U.S.C. § 1338(b), in that the claim is joined with a substantial and related claim under the trademark laws of the United States.

5.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), because all of the Defendants reside in this State and judicial district.

6.     This Court has personal jurisdiction over each of the Defendants, based upon the Defendants' residence in this State and judicial district and conduct of significant business here, and in that the acts of which the Defendants stand accused were undertaken in this State and judicial district.


**THE PLAINTIFF**

7.     Phoenix is a North Carolina limited liability company having its principal place of business in Pineville, North Carolina.


**THE DEFENDANTS**

8.     Defendant DAVID OPPERMAN ("Opperman") is an individual residing in

Colorado who operates a mobile entertainment business under the trade name "Uncle Dutchie's Karaoke," at least one purpose of which is to provide karaoke-related services.

9.      Defendant NED KELLY INC. ("NKI") is a Colorado corporation that operates an eating and drinking establishment under the business name Ned Kelly's Irish Pub, at which karaoke entertainment services are provided.

10.      Defendant TRIPOLAR, LLC ("Tripolar") is a Colorado limited liability company that operates an eating and drinking establishment under the business name "WT Shorty's," at which karaoke entertainment services are provided.

11.      Defendant COLEMAN COMMERCIAL PROPERTY INC. ("CCPI") is a Colorado corporation that operates an eating and drinking establishment under the business name "McCarthy's Sports Bar & Grill," at which karaoke entertainment services are provided.

12.      Defendant XCESSIVE THROTTLE INC. ("XTI") is a Colorado corporation that operates an eating and drinking establishment under the business name "Jake's Roadhouse," at which karaoke entertainment services are provided.

13.      Defendant MARINA ENTERPRISES, INC. ("MEI") is a Colorado corporation that operates an eating and drinking establishment under the business name "Frontier Club," at which karaoke entertainment services are provided.

14.      Defendant 7545 INC. ("7545") is a Colorado corporation that operates an eating and drinking establishment under the business name "Legends of Aurora Sports Grill," at which karaoke entertainment services are provided.

15.      Together, NKI, Tripolar, CCPI, XTI, MEI, and 7545 are referred to as "the

Venue Defendants."

16.     The Defendants are joined in this action because the claims against each arise from the same series of transactions or occurrences, to wit:  a regular series of karaoke shows hosted by Opperman or his employees or agents at the Venue Defendants' establishments.


## BACKGROUND FACTS

17.     Karaoke is a popular form of participatory entertainment commonly found in bars and restaurants and other types of venues and at corporate events, weddings, and other parties throughout the United States.

18.     The basic premise of a karaoke show is that the venue hosting the show provides patrons with access to a sound system and specially prepared karaoke accompaniment tracks, so that individual patrons may perform for the crowd.

19.     Generally, a "karaoke accompaniment track" is an audiovisual work comprising a re-recorded version of a popular song without the lead vocals synchronized to a graphical component containing a lyric display, cueing information, and other information.

20.     When a karaoke accompaniment track is publicly performed, the graphical component is displayed to the patron who is performing and may be displayed to the crowd as well.

21.     Venues that offer karaoke entertainment, including each of the Venue Defendants, do so as part of a commercial transaction wherein the venues supply their patrons with access to karaoke tracks and karaoke entertainment services in exchange

for their patronage of the establishment and the purchase of food and beverages.

22.    The purchase and consumption of alcoholic beverages in connection with karaoke shows is particularly encouraged to enable patrons to overcome inhibitions against singing in public.

23.    Most venues that offer karaoke entertainment, including the Venue Defendants, hire mobile entertainment operators, including Opperman, to make karaoke tracks available for patrons' use and to provide karaoke entertainment services on the venues' behalf.

24.    Phoenix is the owner of SOUND CHOICE®, a federally registered trademark, in connection with which Phoenix licenses and distributes karaoke tracks and, primarily through licensees, provides karaoke entertainment services.

25.    The SOUND CHOICE brand originated with Slep-Tone Entertainment Corporation ("Slep-Tone"), Phoenix's predecessor-in-interest.

26.    Slep-Tone grew out of its founders' original karaoke-related business, founded in March 1985, which consisted of offering recording booths at theme parks as an entertainment service.

27.    As part of that service, the company would supply recording services and SOUND CHOICE backing tracks, to which customers would sing along.

28.    As the recording booth business became popular, customers began to request copies of the backing tracks alone, a development that led the company to offer those tracks for sale.

29.    The backing track business line quickly outstripped the recording booth service, which was divested by about 1990, although Slep-Tone continued to offer and

sponsor karaoke entertainment services from time to time.

30.    SOUND CHOICE was first federally registered as a trademark on February 16, 1988, for "prerecorded magnetic cassette tapes containing popular music compositions," Reg. No. 1,476,683, which is now canceled, having been superseded by a broader registration obtained in 1995.

31.    SOUND CHOICE-branded karaoke tracks are wildly popular among karaoke entertainment providers, patrons, and home consumers.  According to some estimates, as corroborated by investigative data, more than 50% of all accompaniment tracks played at commercial karaoke shows in the United States are SOUND CHOICE-branded tracks.

32.    The popularity of SOUND CHOICE karaoke tracks derives from the market's perception that the recordings are usually the most faithful to the sound of the original recording artist, a characteristic highly valued by karaoke singers.

33.    SOUND CHOICE karaoke tracks are also perceived by the market as providing highly accurate singing cues as part of the video display, a characteristic that is also highly valued by karaoke singers.

34.    Likewise, the association of the SOUND CHOICE brand with a mobile entertainment operator's karaoke business and/or with a venue's karaoke entertainment offerings confers on the operator and venue a perception in the marketplace—and among karaoke patrons—of legitimacy and professionalism.

35.    Like all karaoke tracks, SOUND CHOICE tracks are easily and frequently (though illicitly) duplicated and shared among karaoke professionals for the express purpose of making those karaoke tracks available at commercial karaoke shows.

36. Specifically, karaoke accompaniment track users have used the available technology to place the duplicated contents of one purchased disc on two or more computer systems for simultaneous use in karaoke shows; to place the duplicated contents of their patrons' discs on their own computer hard drives for use in karaoke shows; to "swap" song files with other users; to obtain and share karaoke tracks via file-sharing sites and torrents; to purchase computer hard drives that were pre-loaded with duplicates of karaoke tracks; and, in cases when discs were actually purchased, to sell any original media they might have owned in the secondary market once they have made copies.

37. This distribution allows karaoke accompaniment track users to gain the benefit of using SOUND CHOICE-branded karaoke tracks without paying for original media.

38. To the extent that the Defendants, particularly Opperman, have undertaken any of the activities described in the preceding paragraph, those activities have been undertaken wholly without any form of permission from or payment to Phoenix.

## THE RIGHTS OF THE PLAINTIFF

39. Phoenix is the owner of the federal service mark registrations listed in Annex A hereto ("the Sound Choice Marks"), by virtue of an assignment instrument from Slep-Tone dated February 15, 2015.

40. Slep-Tone acquired its rights in the Sound Choice Marks by virtue of its registrations based on use of the marks in connection with the sale of karaoke

accompaniment tracks from as early as 1987 and in connection with the advertising and performance of karaoke entertainment services, directly from the 1980s onward and by related companies that include hundreds of controlled licensees from 2007 onward.

41.     Phoenix and its predecessor have, for the entire time the Sound Choice Marks have been federally registered, provided the public, including the Defendants, with notice of those federal registrations through the consistent application of the symbol ® to its marks in connection with its goods and services, when appropriate.

42.     Principally, the Sound Choice Marks are indicators of Phoenix as the origin of karaoke entertainment services provided in connection with the Sound Choice Marks.

43.     Among other things, Phoenix is in the business of licensing the Sound Choice Marks for karaoke entertainment services provided to patrons of commercial customers.

44.     The right to display the Sound Choice Marks in connection with commercial karaoke shows requires karaoke operators to acquire a license from Phoenix.

45.     Phoenix's licensing programs all require the operator to expend thousands of dollars, with the exact amount depending on the specific licensing arrangement selected.

46.     Phoenix's licensing programs also require the operator to submit to quality control procedures Phoenix has established for the purposes of protecting its Sound Choice brand.

47.     Phoenix and its predecessor have entered into more than 500 license

agreements for the Sound Choice Marks with commercial karaoke operators in the United States, Canada, Mexico, Australia, and New Zealand.

48.     Phoenix is also the sole owner of Sound Choice Entertainment, LLC, a Texas limited liability company ("SCE") that is engaged in the business of providing karaoke entertainment services to venues in various locations around the United States, and which is preparing to enter the Colorado market.

## THE ACTIVITIES OF THE DEFENDANTS

**A.     Opperman**

49.     Opperman operates a large mobile entertainment business through which he and his agents provide karaoke entertainment services to venue customers and other customers.

50.      In order to supply karaoke entertainment services to a venue, Opperman prepares and executes a karaoke show, either himself or through one or more persons in his employ, by acquiring, or acquiring access to, appropriate sound equipment for playing karaoke accompaniment tracks; connecting the sound equipment to a source for karaoke accompaniment tracks; causing selected karaoke accompaniment tracks to be played over the sound equipment; encouraging the venue's patrons to participate in the show; controlling the organization and flow of the performances; and acting as the on-microphone emcee of the show.

51.     During the course of supplying these karaoke entertainment services, Opperman repeatedly displays the Sound Choice Marks in connection with the services, often dozens of times over the course of a typical four-hour karaoke show.

52.     Because of the well-known association of the Sound Choice Marks with karaoke entertainment services, the display of the Sound Choice Marks in connection with the services, regardless of the particular song being played, acts as a general advertisement for the services as well as an indicator of the quality of the services being provided.

53.     Because of the frequent, repeated display of the Sound Choice Marks across numerous instances of widely disparate songs, patrons and other consumers of Opperman's karaoke entertainment services are likely to view the display of the Sound Choice Marks as an indicator of the affiliation, connection, or association of Opperman with Phoenix, or of Phoenix's sponsorship or approval of his services and related commercial activities, rather than merely as the creator of the underlying communicative content of any particular song being performed.

54.     Opperman also distributes karaoke accompaniment tracks bearing the SOUND CHOICE marks to patrons by transporting those tracks in commerce and making them available for the patrons to use at karaoke shows, in exchange for money paid by the Venue Defendant at whose establishment the karaoke show takes place.

55.     The tracks Opperman distributes were not manufactured by Phoenix or by its predecessor-in-interest; rather, Opperman himself manufactured the tracks he distributes, by making copies from an unknown source and placing those copies onto multiple computer hard drives.

56.     Opperman did not have Phoenix's authorization to manufacture karaoke accompaniment tracks marked with the SOUND CHOICE brand.

57.     When Opperman made the unauthorized SOUND CHOICE-branded

karaoke tracks, he was not required, on any technological level, also to copy the Sound Choice Marks.

58.     Nevertheless, Opperman affirmatively chose also to copy the Sound Choice Marks when copying the tracks he used, in part because of an intent to trade upon the business goodwill associated with the Sound Choice Marks, knowing that the omission of these marks would make his karaoke services business less attractive to patrons and venue customers.

59.     The foregoing activities undertaken in connection with the Sound Choice Marks were undertaken in derogation of Phoenix's rights in the Sound Choice Marks.

60.     Opperman's services, as undertaken in connection with the display of the Sound Choice Marks, were also therefore counterfeit.

61.     Consumers of Opperman's services are likely to be confused regarding the affiliation or connection of Opperman with Phoenix, based on their mistaken belief that the goods being distributed to them are bona fide and authorized and that the services being provided are provided with Phoenix's knowledge and approval.

62.     As a result of those activities, Phoenix has been damaged through the loss of revenues associated with the sale or licensing of legitimate goods and services, as well as through the loss of Phoenix's ability to control the quality of goods distributed and services provided in connection with the Sound Choice Marks.

63.     Phoenix owns the copyright in a substantial number of karaoke accompaniment tracks. It believes that Opperman has additionally infringed the copyright in at least some of those tracks, but it has not yet been able to identify any specific instances of copyright infringement.

**B.     The Venue Defendants' Infringement of the Sound Choice Marks**

64.     Each of the Venue Defendants hosts karaoke shows comprising karaoke entertainment services at its establishment.

65.     At these karaoke shows, each Venue Defendant supplies karaoke entertainment services to its patrons by contracting with an operator, in this case Opperman, as its agent for doing so.

66.     As the patrons are supplied with karaoke entertainment services, the Sound Choice Marks are repeatedly displayed in connection with the services.

67.     Because of the well-known association of the Sound Choice Marks with karaoke entertainment services, the display of the Sound Choice Marks in connection with the services, regardless of the particular song being played, acts as a general advertisement for the services as well as an indicator of the quality of the services being provided.

68.     Because of the frequent, repeated display of the Sound Choice Marks across numerous instances of widely disparate songs, patrons who receive karaoke entertainment services from each of the Venue Defendants are likely to view the display of the Sound Choice Marks as an indicator of the affiliation, connection, or association of the particular Venue Defendant with Phoenix, or of Phoenix's sponsorship or approval of the services and related commercial activities, rather than merely as indicating Phoenix as the creator of the underlying communicative content of any particular song being performed.

69.     The foregoing activities undertaken in connection with the Sound Choice Marks were undertaken in derogation of Phoenix's rights in the Sound Choice Marks.

70.     Each Venue Defendant's patrons are likely to be confused regarding the affiliation or connection of that Venue Defendant with Phoenix, based on their mistaken belief that the services being provided are provided with Phoenix's knowledge and approval.

71.     As a result of those activities, Phoenix has been damaged through the loss of revenues associated with the sale or licensing of legitimate services, as well as through the loss of Phoenix's ability to control the quality of services provided in connection with the Sound Choice Marks.

72.     The karaoke entertainment services each Venue Defendant provides to its patrons are an essential part of a commercial transaction wherein the patrons purchase food and beverages and receive access to the services in connection with their patronage, even if the patrons do not directly pay for access to the services.

73.     When the karaoke shows are ongoing, the shows are generally the principal entertainment focus of the Venue Defendant's establishment.

74.     Each Venue Defendant derives value from these karaoke shows in the form of increased patronage and increased sales of food and beverages.

75.     Upon information and belief, each Venue Defendant has advertised the availability of karaoke shows on its premises, via its own advertising apparatus and as an activity attributable to its business, rather than as adjunct or auxiliary to its business.

76.     Each Venue Defendant has had actual knowledge of the foregoing activities being undertaken at its establishment.

77.     Specifically, each Venue Defendant was notified by Phoenix, by letters dated as indicated and delivered on or about the date indicated in the table below, of

the unlicensed, infringing character of the karaoke entertainment services being

provided in its establishment:

| Addressee | Letter Date | Delivery Date |
|---|---|---|
| **NKI:**<br><br>Ned Kelly Inc.<br>Andrew Toole, Agent<br>2330 S Broadway<br>Denver, CO 80210-5007 | 8/2/2016 | 8/5/2016 |
| Andrew Toole<br>Ned Kelly's Irish Pub<br>5686 S Sycamore St<br>Littleton, CO 80120-1134 | 8/2/2016 | 8/5/2016 |
| **Tripolar:**<br><br>ATTN: Owner or Manager<br>Tripolar, LLC d/b/a WT Shorty's<br>990 S Oneida St<br>Denver, CO 80224 | 8/3/2016 | 8/6/2016 |
| **CCPI:**<br><br>Edward Coleman<br>McCarthy's Sports Bar and Grill<br>15350 E Smoky Hill Rd<br>Aurora, CO 80015-1492 | 8/2/2016 | 8/5/2016 |
| Coleman Commercial Property Inc.<br>Edward Coleman, Agent<br>McCarthy's Sports Bar and Grill<br>20901 E Crestline Cir<br>Centennial, CO 80015-3619 | 8/3/2016 | 8/5/2016 |
| **XTI:**<br><br>Xcessive Throttle Inc.<br>Calvin D. Jacobsen, Agent<br>5980 Lamar St<br>Avada, CO 80003 | 8/3/2016 | 8/5/2016 |

| | | |
|---|---|---|
| **MEI:**<br><br>Marina Enterprises, Inc.<br>Mitchell Marina, Agent<br>18881 E Colfax Ave<br>Aurora, CO 80014 | 8/3/2016 | 8/7/2016 |
| **7545:**<br><br>7545 Inc.<br>Ronald Steve Sundberg, Agent<br>13690 E Iliff Ave Ste J<br>Aurora, CO 80014 | 8/3/2016 | 8/5/2016 |

78.     In the letter, each Venue Defendant was offered information about licensing and compliance programs that Phoenix offers to venues that feature karaoke entertainment, along with the opportunity to bring their karaoke entertainment services into compliance with the law and with Phoenix's policies regarding the use of its intellectual property.

79.     In particular, each Venue Defendant was offered the opportunity, at no charge, to request, via Phoenix's Safe Harbor program, that Phoenix evaluate the licensing status and needs of its karaoke entertainment provider and to avoid liability as long as the Venue Defendant took heed of Phoenix's evaluation and acted accordingly.

80.     None of the Venue Defendants took advantage of the Safe Harbor program.

81.     Despite these offers, and despite their knowledge of the unlicensed, infringing character of the karaoke entertainment services being provided in their establishments, the Venue Defendants elected not to bring their karaoke entertainment services into compliance.

82.     In particular, each Venue Defendant has the right to control whether or not

the activities occur on its premises.

83.     As noted previously, each Venue Defendant had specific knowledge of its agents' direct infringement of the Sound Choice Marks.

84.     Despite this knowledge, each Venue Defendant continued to use those agents to commit direct infringement of the Sound Choice Marks during the course of providing karaoke entertainment services to its patrons.

85.     Each Venue Defendant has the right to control the means and the details of the process by which Opperman (or any other agent) accomplishes his respective tasks, including, without limitation, controlling the dates and starting and stopping times of shows, determining whether particular content (such as offensive-language content) is permitted to be played at shows, determining the style and genre of music played at shows, and determining whether Opperman is permitted to use the venue's equipment (such as television displays, sound equipment, stage, etc.) as part of the shows.

86.     Each Venue Defendant consented to an arrangement by which Opperman would provide karaoke entertainment services on its behalf and subject to its control, and Opperman likewise consented so to act.

87.     Despite their knowledge of the infringing character of the activities and ability to control whether those activities occur, the Venue Defendants each elected not to stop the infringement from occurring.

88.     As such, to the extent that they are not directly liable as an infringer, each of the Venue Defendants is liable as a secondary infringer for the continuing infringement that has occurred and is occurring on its premises.

**C.     The Defendants' pattern of infringing conduct**

89.     The Defendants' conduct as described above with respect to the Sound Choice Marks extends as part of a large-scale program of infringing activities and piracy.

90.     Essentially, the Defendants have built an entire business model and moneymaking scheme premised on a competitive advantage derived from the infringement of the intellectual property rights of others, including Phoenix.

91.     The Defendants' activities directly compete with Phoenix's own licensees and Phoenix's wholly owned subsidiary company, SCE, by using identical but unauthorized trademarks in connection with services that are neither authorized nor subject to Phoenix's quality control.

92.     The Defendants' wrongful conduct exerts illegitimate and unfair pressure upon the market for karaoke services in this State and judicial district through the unlicensed use of pirated material belonging to Phoenix, thereby diminishing the value of licenses and permissions in the hands of Phoenix, its subsidiary, and its licensees.

93.     The diminution of the value of licenses encourages or forces karaoke operators to forego licenses in order to compete profitably.

94.     Upon information and belief, the Defendants' misconduct has cost Phoenix in excess of $100,000 in revenue from legitimate sources crowded out of the market by their wrongful conduct.

/ / /

## FIRST CLAIM FOR RELIEF
## TRADEMARK INFRINGEMENT UNDER 15 U.S.C. § 1114(1)

95.     Each Defendant used a reproduction, counterfeit, or copy of the Sound Choice Marks in connection with the provision of services including karaoke services, by repeatedly displaying a reproduction, counterfeit, or copy of the Sound Choice Marks during the provision of those services.

96.     Defendant Opperman used a reproduction, counterfeit, or copy of the Sound Choice Marks in connection with the distribution of goods including karaoke accompaniment tracks, by copying karaoke accompaniment tracks, marking the tracks with the Sound Choice Marks, and transporting the marked tracks in commerce in order to supply those tracks to patrons at the Venue Defendants' establishments.

97.     Each Defendant's use of the Sound Choice Marks was "in commerce" within the meaning of the Trademark Act of 1946 as amended.

98.     Phoenix did not license any Defendant to use the Sound Choice Marks in connection with the provision of their goods or services.

99.     Each Defendant's use of the Sound Choice Marks is likely to cause confusion, or to cause mistake, or to deceive its customers and patrons into believing that the goods and services being provided are provided with the authorization of Phoenix.

100.    Each Defendants' use of the Sound Choice Marks in connection with their karaoke entertainment services infringes both the "goods" Sound Choice Marks and the "services" Sound Choice Marks because karaoke entertainment services are within the zone of natural expansion of Phoenix's karaoke accompaniment track business.

101.    Each Defendant's acts were willful, knowing, and intentional.

102.   Each of the Venue Defendants is additionally vicariously or contributorily liable for the acts of that agent that infringe the Sound Choice Marks.

103.   Each Defendant's activities therefore constitute the infringement of the federally registered Sound Choice Marks in violation of 15 U.S.C. § 1114(1).

104.   Phoenix has been damaged by each Defendant's infringing activities.

105.   Unless enjoined by the Court, each Defendant's infringing activities as described above will continue unabated and will continue to cause harm to Phoenix.

## SECOND CLAIM FOR RELIEF
### UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)

106.   Each Defendant has supplied karaoke entertainment services to customers or patrons, in connection with which the Sound Choice Marks were used in the advertising and performance of the services and not merely as an adjunct to the playing of any particular communicative content contained within karaoke accompaniment tracks.

107.   The use of the Sound Choice Marks is likely to cause confusion, or to cause mistake, or to deceive the customers or patrons into believing, falsely, that Phoenix approved the Defendant's services and commercial activities.

108.   Because of each Defendant's wholly unauthorized uses of the Sound Choice Marks in the manner described above, Phoenix was denied revenue from the sale or licensing of authorized services and deprived of control over the use of the Sound Choice Marks.

109.   Because Phoenix has been denied this revenue and control, it has been damaged by each Defendant's uses.

110.    Phoenix is a provider of karaoke entertainment services, directly, through controlled licensees, and through its wholly owned subsidiary SCE.

111.    Each Defendant's activities are part of a program and money-making scheme premised upon the provision of unlicensed karaoke entertainment services undertaken in connection with the Sound Choice Marks.

112.    Each Defendant's activities in furtherance of this program of infringement have caused a competitive injury to Phoenix, both directly and on the basis of damage to SCE and to Phoenix's licensees.

113.    Each Defendant's activities constitute unfair competition in violation of 15 U.S.C. § 1125(a).

114.    Unless enjoined by the Court, each Defendant's unfair competition activities as described above will continue unabated and will continue to cause harm to Phoenix.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Phoenix prays for judgment against each of the Defendants severally, and that the Court:

A.    Find that each Defendant has committed acts of infringement, including but not limited to counterfeiting, of the federally registered Sound Choice Marks, in violation of 15 U.S.C. § 1114(1);

B.    Find that each Defendant has engaged in unfair competition detrimental to Phoenix in violation of 15 U.S.C. § 1125(a);

C.    Enter judgment against each Defendant and in favor of Phoenix on all applicable counts;

D.      Award to Phoenix each Defendant's profits and the damages sustained by Phoenix because of that Defendant's conduct in infringing the Sound Choice Marks, or, in the alternative, statutory damages per trademark infringed by counterfeiting, and in any event in an amount not less than $50,000 per Defendant;

E.      Award to Phoenix each Defendant's profits and the damages sustained by Phoenix because of that Defendant's acts of unfair competition under 15 U.S.C. § 1125(a);

F.      Award to Phoenix treble, punitive, or otherwise enhanced damages, as available, upon a finding that any Defendant acted willfully in the conduct of its infringement;

G.      Grant Phoenix preliminary and permanent injunctive relief against further infringement of the Sound Choice Marks and the Chartbuster Karaoke Marks and further false designations of origin;

H.      Award Phoenix its costs of suit and attorney's fees, to the extent not awarded above; and

I.      Grant Phoenix such other and further relief as justice may require.


Respectfully submitted this the 22nd day of June, 2017.

s/ James M. Harrington
James M. Harrington
Phoenix Entertainment Partners, LLC
610 Old Campbell Road, Suite 112
Richardson, TX 75080
Telephone: (214) 396-7288
E-mail: jim@phxep.com
Attorney for Plaintiff
      Phoenix Entertainment Partners, LLC

## <u>ANNEX A</u>

### SOUND CHOICE FEDERAL TRADEMARK REGISTRATIONS

**Reg. No.      Mark                                              Reg. Date**
**Goods/Services**

1,923,448      SOUND CHOICE                              October 3, 1995
pre-recorded … compact discs containing musical compositions and compact discs
containing video related to musical compositions

2,000,725      SOUND CHOICE & Design (see below)      September 17, 1996
pre-recorded … compact discs containing musical compositions and compact discs
containing video related to musical compositions

4,099,045      SOUND CHOICE                              February 14, 2012
Conducting entertainment exhibitions in the nature of karaoke shows

4,099,052      SOUND CHOICE & Design (see below)      February 14, 2012
Conducting entertainment exhibitions in the nature of karaoke shows

"SOUND CHOICE & Design" refers to the following display mark:

